IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPIREON, INC., | No. C 12-01903 |
| Plaintiff, | **CLAIM CONSTRUCTION ORDER** |
| v. | |
| CALLPASS TECH, LLC, | |
| Defendant. | |

On February 13, 2013, the Court held a *Markman* hearing regarding the construction of certain disputed terms in two patents owned by plaintiff. Having considered the arguments of counsel and the papers submitted, the Court construes the disputed terms as follows.

**BACKGROUND**

This is a patent infringement action initiated by plaintiff Spireon, Inc. against defendant CallPass Tech LLC. Spireon asserts claims 1-6, 10-11, 13 and 18 of U.S. Patent No. 6,025,774 (the "'774 patent") and claims 1-7, 10, 13, 15, 18-19 of U.S. Patent No. 6,249,217 (the "'217 patent"). Both patents received Reexamination Certificates. Joint Claim Construction Statement (Dkt. 23), Ex. B and D.

**1.     The Patents**

According to the complaint, Spireon purchased the patents in suit on or about June 27, 2011. Prior to that, Spireon (previously named ProconGPS, Inc.) had obtained non-exclusive licenses for the patents and built a business in the vehicle finance tracking industry. Compl. (Dkt. 1) ¶¶ 11-12. Both

1 patents are titled "Method for Retrieving Vehicular Collateral," and concern location tracking in the
2 subprime vehicle finance industry. According to Spireon, the improved security of collateral in the form
3 of the vehicle itself has allowed auto dealers and financial institutions to "offer their products and
4 services to a dramatically wider market." *Id.* ¶ 12. Spireon alleges that defendant's various products
5 and services infringe the asserted patents, literally or under the doctrine of equivalents, directly or
6 indirectly (through induced or contributory infringement).

7 The patents in suit were subject to an *ex parte* reexamination in the PTO requested by an
8 independent third party, and in June 2011, the PTO issued a Certificates of Reexamination for each
9 patent. Joint Claim Construction Statement (Dkt. 23), Exs. B and D. The independent claims of the
10 patents were amended to include the use of GPS technology.[1] Spireon alleges that the defendant has
11 been aware of the reexamination and of the infringing status of its products, and that its infringement
12 has been willful. *Id.* ¶¶ 15, 21.

13 The patents share the same title ("Method For Retrieving Vehicular Collateral") and written
14 description, which describes the method as follows:

> In accordance with the present invention, there is provided a method of securing collateral for a loan when indicated by a loan status wherein the collateral is a vehicle. The method provides for installing a transmitter within the vehicle. The transmitter is capable of transmitting locational data regarding the vehicle. The loan status is monitored for a default condition. A data link is established from a base terminal to the transmitter of the vehicle upon an occurrence of the default condition in the loan status. Locational data is transmitted from the transmitter of the vehicle to the base terminal via the data link. The location of the vehicle is determined from the locational data transmitted to the base terminal. Finally, the vehicle is confiscated.
>
> '774 (Abstract)

21 There is one independent claim in the '774 patent (disputed terms are in bold):

> **1**. A **method of securing collateral for a loan** when indicated by a loan status wherein the collateral comprises a vehicle, the method comprising the steps of:
> (a) installing a transmitter within the vehicle, the transmitter being capable of transmitting locational data regarding the vehicle;
> (b) monitoring the loan status for a default condition;
> (c) **establishing a data link from a base terminal to the transmitter** of the

---

[1] Specifically, claims 1 (quoted as amended, *infra*) and 11 of the '774 patent were amended to include the "wherein" clauses; the previous dependent claims were deemed patentable with amendments; and new claims 16-24 were added. With respect to the '217 patent, claim 11 was cancelled; claims 1 (quoted as amended, *infra*) and 15 were amended; prior dependent claims were deemed patentable with amendments; and new claims 16-26 were added.

> vehicle **upon an occurrence of the default condition in the loan status**;
>
> (d) transmitting locational data from the transmitter of the vehicle to the base terminal via the data link;
> (e) determining the location of the vehicle from the locational data transmitted to the base terminal; and
> (f) confiscating the vehicle;
> wherein step (a) further comprises the step of: (1) installing a GPS positioning signal receiver; and
> wherein step (c) further comprises the step of: (1) receiving a GPS positioning signal; and
> wherein the transmitted locational data being based upon the received GPS positional signal. ('774 Reexamination Certificate, 1:25-47).

The two independent claims in the '217 patent are similar (disputed terms are in bold):

> **1.** A **method of securing collateral for a loan** when indicated by a loan status, the collateral comprises a vehicle, a transmitter capable of transmitting locational data regarding the vehicle is installed within the vehicle, the method comprising the steps of:
> (a) receiving a signal in response to a change in the loan status;
> (b) **establishing a data link from a base terminal to the transmitter** upon the receipt of the **signal representative of a change in the loan status**;
> (c) transmitting locational data from the transmitter to the base terminal via the data link; and
> (d) determining the location of the vehicle from the locational data transmitted to the base terminal for use in confiscating the vehicle;
> wherein a GPS positioning signal receiver is installed within the vehicle and the transmitted locational data is based upon a received GPS positioning signal. ('217 Reexamination Certificate, 1:27-45).

Two additional terms occur in dependent claims:

Dependent claim 15 of '217 is identical to Claim 1, except that step (b) ends with "**signal representative of the loan status being in a default condition**." ('217 Reexamination Certificate, 1:52-1:55).

Dependent claim 18 recites: "The method of claim 1, further comprising **establishing a data link from a global positioning satellite (GPS) to the GPS positioning signal receiver upon receipt of a transmit request signal**." ('217 Reexamination Certificate, 2:13-16).

**2.    Prior Construction Order**

Several of the terms in the present case were previously considered in *ProconGPS, Inc. v. Star Sensor, LLC*, Case No. 11-cv-03975-SI, Dkt. No. 80 ("*ProconGPS* Order"), an infringement action asserting the same patents. Spireon (formerly ProconGPS) takes a consistent position in the present

1  case.

| Term to be Construed | Prior Construction |
|---|---|
| **1.** "establishing a data link from a base terminal to the transmitter" | "establishing a data link between a base terminal and the transmitter" |
| **2.** "upon an occurrence of the default condition in the loan status" | "following an occurrence of the default condition in the loan status" |
| **3.** "signal representative of a change in the loan status"/"signal representative of the loan status being in a default condition" | No construction necessary |

The Court rejected Star Sensor's argument that establishing a data link from a base terminal to the transmitter contained a directionality requirement. *Id.* at 12. The Court also rejected Star Sensor's arguments that "upon" should be defined as "at the time of and as a result of an occurrence" based on the lack of evidence that the only time a signal can be transmitted is in connection with a change in status or the occurrence of default condition. *Id.* at 12.[2]

## LEGAL STANDARD

Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372 (1996). Terms contained in claims are "generally given their ordinary and customary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312. In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at 1313; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

Accordingly, although claims speak to those skilled in the art, claim terms are construed in light of their ordinary and accustomed meaning, unless examination of the specification, prosecution history,

---

[2] CallPass proposes a different construction of "upon."

4

and other claims indicates that the inventor intended otherwise. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). While claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark*, 156 F.3d at 1187; *see also Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008) ("[The] description of a preferred embodiment, in the absence of a clear intention to limit claim scope, is an insufficient basis on which to narrow the claims."); *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345-46 (Fed. Cir. 2008) (refusing to limit claim language to the disclosed embodiment in the absence on indication that the inventor meant to limit the claim language). However, it is a fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316.

Finally, the Court may consider the prosecution history of the patent, if in evidence. *Markman*, 52 F.3d at 980. In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id.* at 1319.

## DISCUSSION

Courts are to determine the "ordinary and customary meaning of a claim term, [that is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the

invention." *Phillips*, 415 F.3d at 1312-13.  Spireon notes, as it had previously stated in concurrent litigation, that in this case, a person of ordinary skill in the art is a person with 1-2 years in the "buy here pay here" or "subprime" vehicle finance industry; the patentee, Mark Forbes, was a "repo man." Baum Decl., Ex. 4 (Dkt. 25-5), Chen Declaration at ¶ 10.  CallPass does not dispute this standard.  In the August 9, 2012 Claim Construction Order addressing the same patents-in-suit, the Court adopted this standard for a person of ordinary skill in the art in question.  *ProconGPS, Inc. v. Star Sensor et al, see* Case No. 11-03975, Dkt. 80, at 6 ("*ProconGPS* Order").  Thus, the present patent claims are not addressed to an audience with significant technical expertise.  *Phillips* further dictates:

> The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. . . . In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.

*Phillips*, 415 F.3d at 1312-14 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed.Cir. 2001)).

**1. "establishing a data link from a base terminal to the transmitter"**

| Prior Construction | Spireon | CallPass |
|---|---|---|
| establishing a data link between a base terminal and the transmitter | No change from prior construction | No construction required |

The parties dispute whether "from a base terminal to the transmitter" includes a directionality requirement.  Spireon contends that the Court's previous construction of this term as "establishing a data link between a base terminal and the transmitter" is supported because the specification uses the words "between . . . and" as demonstrated by the portion of Figure 2 of the '774 patent, which is referred to as the "flow diagram of steps of the method of the *present invention*" ('774: 2:57-58) (emphasis added):



6

1  CallPass contends that the words "from . . . to" constitute a claim limitation and that the substitution of
2  "between" "inappropriately broadens the scope of the claims." CallPass's Claim Construction Brief
3  (Dkt. 26, "Def. Br.") at 1. The Federal Circuit has held, however, that when references to "the present
4  invention" do not use uniform language with respect to the rest of the specification, there is no clear
5  disclaimer or disavowal of scope. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136-
6  37 (Fed. Cir. 2011) (collecting prior cases). Therefore, the use of "from . . . to" in some parts of the
7  specification does not explicitly disclaim the "between . . . and" construction used in reference to the
8  present invention in the flow chart.

9  Spireon also argues that the previous construction is correct because the embodiments include
10  scenarios where the transmitter originates the signal, such as when the transmitter or the car is being
11  tampered with. *See* '774, 5:27-37 ("the retrieval apparatus 12 and/or components thereof (e.g.,
12  transmitter 14, base communication receiver 16, GPS positioning signal receiver 22, etc.) are configured
13  to be capable of sensing any physical tampering therewith and transmitting a tamper signal in response
14  to any sensed tampering"). Spireon further notes that a "claim interpretation that excludes a preferred
15  embodiment from the scope of the claim is rarely, if ever, correct." Pl. Reply at 6 (quoting *On-Line*
16  *Techs., Inc. v. Bodenseewerk Perkin–Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004)).

17  CallPass argues that there is no reason to construe the term, because the words "from . . . to"
18  are readily understandable by a lay person, and that "actual words in a claim must be given their actual
19  meaning." Def. Br. at 6, citing *Chef America Inc. v. Lamb-Wesson Inc.*, 358 F.3d 1371 (Fed. Cir. 2004)
20  (refusing to change claim language regarding heating "to a temperature" in the range of about 400° F.
21  to 850° F. to "at a temperature" even though specification supported the latter interpretation because
22  "[i]t is the job of the patentee, and not the court, to write patents carefully and consistently."). CallPass
23  also points to a preferred embodiment which states:

24  Upon the loan status being in a default condition 32, the base terminal 20
   originates and transmits 36 a transmit signal request. The base communications
25  receiver 16 is configured to receive the transmit request signal from the base
   terminal 20. *Thus*, a data link is established between the base terminal 20 and
26  retrieval apparatus 12 disposed within the vehicle 10.

27  ('774, 4:4-13) (emphasis added).

28  However, CallPass does not address in its brief an embodiment where the transmitter initiates

7

a data link upon tampering. *See* '774, 5:27-37. More recently, the Federal Circuit has held that the "court strives to reach a claim construction that does not render claim language in dependent claims meaningless." *Ortho-McNeil Pharm., Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008) (citing *Rambus Inc. v. Infineon Tech. AG*, 318 F.3d 1081, 1093 (Fed. Cir. 2003)). In particular, claim 7 of the '774 patent recites:

> 7. The method of claim 1 wherein the transmitter is capable of sensing any physical tampering therewith and transmitting a tamper signal in response to any sensed tampering, step (c) further comprises the step of: (1) establishing the data link from the base terminal to the transmitter upon the sensing of any physical tampering with the transmitter.

('774, 7:33-39) (The '217 patent contains similar claim as claim 8). In this claim, it is the transmitter which is being tampered with and which must initiate the data link, but the data link is still described as "from the base terminal to the transmitter." Therefore, this use of the words "from . . . to" suggests that "establishing a data link" does not have a directional requirement and is the same as "between."

At oral argument, CallPass argued that the dependent claim should be interpreted as the transmitter sends a tampering signal directly to the financial institution, which then initiates establishing the data link from the base terminal to the transmitter. Such an interpretation, while plausible, is not the most reasonable interpretation of the patent language. Figure 1 shows the transmitter/receiver unit in the car communicating with the base terminal and the GPS satellite only, and there is no separate direct link to the financial institution. The communication between the transmitter/receiver and the base terminal is indicated to be moving in both directions by the curved lines emanating from each end. Figure 2 includes a "Verify Operation" 52 and "Tampering" 54 check steps, which proceed directly to "Establish A Data Link Between Base Terminal and Transmitter/Receiver" 34 step. Finally, the specification states: "In addition, the transmitter is capable of sensing any physical tampering therewith and a tamper signal is transmitted in response to any sensed tampering *via data link*." ('774, 1:67-2:3) (emphasis added). This interpretation is also consistent with the "[t]hus, a data link is established" specification language quoted *supra*. *See* '774, 4:4-13. There is no separate step describing contact between the transmitter/receiver and any other device that could then initiate the data link. Requiring the addition of such a step would add significant content to the claims and specification that is not present there.

8

In *Ortho-McNeil*, the Federal Circuit distinguished the facts from *Chef America*, finding that:

> *Chef America* does not require this court or the district court to interpret [the word "and"] according to its most common usage in the dictionary. To the contrary, this court and the district court must interpret the term to give proper meaning to the claim in light of the language and intrinsic evidence. Giving "and" its most common dictionary meaning would produce in this case the nonsensical result of. . . rendering several other dependent claims meaningless.

520 F.3d at 1362. The Court finds that *Ortho-McNeil* applies here, and the most reasonable interpretation of "from . . . to" in light of the specification and the dependent claim is that no directionality is required; thus, the Court maintains it previous construction. Therefore, the Court construes **establishing a data link from a base terminal to the transmitter** as: **establishing a data link between a base terminal and the transmitter**.

### 2. "upon an occurrence of the default condition in the loan status"

| Prior Construction | Spireon | CallPass |
| --- | --- | --- |
| following an occurrence of the default condition in the loan status | No change from prior construction | immediately following or very soon after an occurrence of the default condition in the loan status |

CallPass seeks to add "immediately" or "very soon" to the construction because it is concerned that the "Plaintiff intends to abuse the construction by using the word 'following' in a way that does not mean 'upon.' Instead, Plaintiff apparently intends to assert that the claims encompass locating a vehicle by GPS *at any time* after a loan goes into default, even coincidentally." Def Br. at 8. (emphasis in the original). CallPass cites dictionaries for the differences of meaning between "upon" and "following." However, CallPass does not present any intrinsic evidence that supports the view that "upon" is intended to mean "immediately or very soon after" in the context of the patent.[3]

Spireon rebuts this accusation, and argues that "immediately" or "very soon" would introduce

---

[3] CallPass refers to Edgar Allen Poe's poem "The Raven," which begins with "Once upon a midnight dreary…." to argue that "upon" means "on a dreary midnight, not to events that happened on some other day, month, or year that was after that dreary midnight." *Id.* That is, however, not relevant to the term being construed, as "once upon" is "used at the beginning of children's stories to mean 'a long time ago'" or "used in a slightly literary way when referring to something that happened in the past." *Cambridge Advanced Learner's Dictionary & Thesaurus* © Cambridge University Press; http://dictionary.cambridge.org/dictionary/british/once-upon-a-time

1 further ambiguity. Spireon argues that "following" captures the meaning as described in the
2 specification:

> The method of the present invention may further include monitoring 30 the status of the loan to [sic] for a delinquent condition 50 and *subsequently* establishing 34 a data link from the base terminal to the transmitter 14 upon an occurrence of the delinquent condition.

('774, 4:24-29) (emphasis added). Spireon notes that in the context of loan payments, time is measured in business days, and there may be a delay in real time between actions, such as when "a default condition occurs when a vehicle holder fails to make a payment by the close of business on a Friday (i.e., pay day). In that case, the 'establishing a data link' step might occur on the following day, or even the following Monday." Pl. Br. at 10.

The Court finds that because a person of ordinary skill in the art would have experience with subprime loan financing, rather than technology of signal transmission, it is a reasonable interpretation of the patent language that "upon" may mean the following business day and may include a delay in real time between loan status change and transmission of signal. A reasonable jury is unlikely to interpret "following" or "upon" to mean that no connection to default loan status was intended by the patentee, as CallPass fears. At oral argument, both parties conceded that "following on" substantially captures the meaning of "upon" in the claims, and the Court finds "following on" to be essentially synonymous with "following." Therefore, the Court construes **upon an occurrence of the default condition in the loan status** as: **following an occurrence of the default condition in the loan status**.

**3. "signal representative of a change in the loan status" ('217, Claim 1) and "signal representative of the loan status being in a default condition" ('217, Claim 15)**

| Prior Construction | Spireon | CallPass |
|---|---|---|
| No construction necessary | No construction necessary | signal that provides data regarding the loan status / signal that provides data regarding the loan status being in a default condition |

CallPass argues that construction of this term is necessary because "Plaintiff asserts that the signal need not represent anything." Def. Br. at 10. CallPass contends that this is a "broadening redefinition engaged in by Plaintiff" motivated by infringement analysis. *Id.* at 11. Spireon, however,

does not seek a broadening redefinition but seeks to present the term to the jury as it is stated in the claim. Further, the definition proposed by CallPass does not add anything to the term itself because a "signal representative of a change in loan status" provides data about the loan status, namely that the status has changed or the default condition has occurred. Spireon likens the signal to a "check engine" light on a car that does not communicate the precise status of the engine, but is representative of change in status of the engine. Spireon further notes that the car's transmitter would be unable to utilize any additional data about the loan status (which is true of the base terminal described, as well) but only responds to the signal by establishing a link and transmitting locational data. Because CallPass does not offer sufficient evidence to require the construction of this term and the proposed definition does not add clarity to its plain meaning, the Court again declines to construe the term unnecessarily. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, Ltd., 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("Claim construction 'is not an obligatory exercise in redundancy.'") (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

**4. "method of securing collateral for a loan" ('217, Claim 1, 15; '774, Claim 1)**

| Prior Construction | Spireon | CallPass |
|---|---|---|
| Not subject to construction. The Court declined to construe the term "loan" | No construction necessary | method of locating property that a lender has a right to take from a borrower if the borrower fails to meet the terms of a loan |

CallPass argues that "while a jury would readily understand the word 'loan,' it may not understand that collateral is pledged against the loan, giving the lender the right to take it back if the borrower fails to meet the terms of the loan." Def. Br. at 11. Spireon responds that the preamble term needs no construction because the claims require that the collateral be a vehicle and points to consistent language in the specification. Pl. Br. at 12; *see* '774 Reexamination Certificate, claims 1, 15 ("the collateral comprises a vehicle"), '217 Reexamination Certificate, claim 1 ("wherein the collateral

11

comprises a vehicle").[4]

The Federal Circuit has addressed when a preamble in a claim should be considered limiting:

> [C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention. . . .Without such reliance, however, a preamble generally is not limiting when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention. . . . Thus, preamble language merely extolling benefits or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant. . . . *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001) (steps of claimed method are performed the same way regardless of whether, as stated in the preamble, a reduction of hematologic toxicity occurs).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809-10 (Fed. Cir. 2002) (internal citations omitted).

CallPass contends that the following phrase in the file wrapper supports its proposed construction: "The loan is secured by knowing where the collateral is located." Def. Br. at 12, (citing Harkins Dec. Ex. 9, '774 Reexamination File Wrapper, Ex Parte Reexamination Final Office Action, 12/17/2010, p. 63; '217 Reexamination File Wrapper, Ex Parte Reexamination Final Office Action, 12/17/2010, p. 3.). However, CallPass fails to show how this statement supports its definition or that it constitutes "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." *Catalina Mktg.*, 289 F.3d at 809. The Court finds that as in *Bristol-Myers*, the steps of claimed method would be performed the same way regardless of the proposed construction. *Id. See also Intirtool, Ltd. v. Texar Corp.,* 369 F.3d 1289, 1296 (Fed. Cir. 2004) ("In short, the preamble adds nothing to this highly detailed claim and thus cannot be considered to give 'life, meaning, and vitality' to it."); *Marrin v. Griffin*, 599 F.3d 1290 (Fed. Cir. 2010) (finding that the preamble is not a limitation on claim scope). Without a showing of clear reliance on the preamble in the prosecution history, or the need to construe the term, the Court declines to construe **method of securing collateral for a loan.**

---

[4] The loan process is further described in sufficient detail in the "Background of the Invention" section of the specification. ('774, 1:10-48).

**5. "establishing a data link from a global positioning satellite (GPS) to the GPS positioning signal receiver upon receipt of a transmit request signal" ('217, Claim 18, '774 Claim 18)"**

The parties agree that this term is resolved by the constructions of previously discussed terms: "**establishing a data link from . . . to . . .**" and "**upon**." Def. Br. at 13, Pl. Reply at 11. Therefore, the Court construes **establishing a data link from a global positioning satellite (GPS) to the GPS positioning signal receiver upon receipt of a transmit request signal** as **establishing a data link between a global positioning satellite (GPS) and the GPS positioning signal receiver following receipt of a transmit request signal**.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court adopts the constructions set forth above.

**IT IS SO ORDERED.**

Dated: February 26, 2013

_____
SUSAN ILLSTON
United States District Judge